**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MELISSA P.,**

                                        **Plaintiff,**

        **vs.**                                         **5:20-CV-1007**
                                                          **(TJM)**


**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**


## DECISION & ORDER

        Plaintiff Melissa P. brings this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g), for review of a final determination by the Commissioner of Social Security

denying her application for benefits.  Plaintiff alleges that the Administrative Law Judge's

("ALJ") decision denying her application was not supported by substantial evidence and

contrary to the applicable legal standards.  Pursuant to Northern District of New York

General Order No. 8, the Court proceeds as if both parties had accompanied their briefs

with a motion for judgment on the pleadings.

**I.      BACKGROUND**

        Plaintiff Robin P. filed this action pursuant to 42 U.S.C. § 405(g) to appeal the

Defendant Commissioner of Social Security's denial of her claim for a period disability

benefits.  Plaintiff filed her claim on March 5, 2018.  <u>See</u> Social Security Administrative

1

Record ("R") at 161-162.

After an initial determination denied her application, Plaintiff obtained a representative and appealed the decision. See R. at 67-159. After a hearing, an Administrative Law Judge ("ALJ") denied Plaintiff's request for benefits in a written decision. Id. at 10-31. The Social Security Appeals Council denied Plaintiff's appeal. Id. at 1-6. Plaintiff filed the instant action on August 28, 2020. See dkt. # 1. After the Court received the administrative record, Plaintiff's attorney filed a brief in support of her appeal, and the Commissioner filed a brief in opposition. See dkt. #s 15,16. The matter is now before the Court

## II.    FACTS

The Court will assume familiarity with the facts and set forth only those facts relevant to the Court's decision in the body of the decision below.

## III.    THE ADMINISTRATIVE LAW JUDGE'S DECISION

Administrative Law Judge David Romeo concluded that Plaintiff was not disabled within the meaning of the Social Security Act in a written opinion issued on October 4, 2019. R. at 10-31. The ALJ applied the five-step sequential evaluation process laid out in 20 CFR 4040.1520(a). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 28, 2017, which was the alleged onset date of her condition. Id. at 15. At Step Two, the ALJ found several severe impairments: obstructive sleep apnea; fibromyalgia; left eye vision impairment from a choroidal macular scar; morbid obesity; depression; and anxiety. Id. While Plaintiff also had "cardiovascular impairments," she had not reported any symptoms and test results showed her to be

2

stable.  Id.  The evidence therefore failed to support a finding that Plaintiff's cardiovascular ailments were "severe" within the meaning of the Act.  Id. at 16.  Likewise, a documented Vitamin D deficiency did not reveal any "evidence" of "significant limitations of basic work activities," meaning that such deficiency did not result in "a severe impairment."  Id.  While the record showed that Plaintiff had received treatment for cervical radiculopathy from a chiropractor, only that one chiropractor produced any medical reports on such a condition. Id.  Since "a chiropractor is not an acceptable medical source," the ALJ found that no evidence existed to support this impairment.  Id.

At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments.  Id.  Plaintiff's sleep apnea did not result in a "listing-level impairment," and her fibromyalgia and obesity did not cause any impairment that rose to the level of a listing.  Id.  Plaintiff's vision problems did not meet the listing requirements, largely because vision in one eye was sufficient.  Id.  Likewise, Plaintiff's mental impairments were not severe enough to meet the listings.  Id. at 16-17.  Plaintiff did not have extreme or marked limitations in any of the relevant areas, and she did not have a "documented history of a mental disorder over a period of at least two years with symptoms or signs diminished by treatment, mental health therapy, psychosocial support, or highly structured settings with marginal adjustment or minimal capacity to adapt to changes in the environment or demands that are not part of claimant's daily life."  Id. 17.

The ALJ then found that Plaintiff had the residual functional capacity "to perform medium work as defined in 20 CFR 404.1567(c) except that claimant has no left-sided central vision and no far or near acuity with left eye."  Id. at 17-18.  Plaintiff could "never

3

climb ropes, ladders, or scaffolds, and never be exposed to high exposed places or moving mechanical parts." Id. at 18. Plaintiff could "work at a consistent pace throughout the workday but not at a production pace where each task must be completed within a strict time deadline." Id. Though Plaintiff could "tolerate occasional changes in work setting," she could not "tolerate high volume output, very short deadlines, or high levels of precision." Id. The ALJ concluded that Plaintiff could "occasionally lift, bend, stoop, kneel, crouch, crawl, and climb ramps and stairs, and frequently reach with both upper extremities." Id. She could "tolerate a moderate noise intensity" and "exposure to light brighter than that typically found in an indoor work environment such as an office or retail store." Id. Finally, Plaintiff "would need an option to alternate to sitting for three minutes after every 30 minutes of standing or walking, and she can remain on task while sitting." Id.

The ALJ related how the testimony, medical, and opinion evidence supported this RFC. Id. at 18-22. The ALJ described the symptoms that Plaintiff reported. Id. at 18. Plaintiff testified that she suffered from "a visual impairment, fibromyalgia, sleep apnea, anxiety and depression." Id. She could read books, but could only use a computer on "a limited basis." Id. Plaintiff has used prescription sunglasses under fluorescent lights and while driving during the day." Id. Her husband drives when she travels in the rain or at night. Id. Plaintiff drives herself to medical appointments and for grocery shopping three or four times per week. Id. Bright lights and sunlight causes her headaches. Id. Plaintiff testified that her fibromyalgia caused her "pain all over exacerbated sometimes by stress, weather, or poor sleep." Id. This condition caused "two to three bad days a week." Id. Remaining in one "static position for long periods" made her condition worse. Id. Plaintiff

also testified that she suffered from "a brain fog" that led "her to leave notes for herself and take naps," which "contribut[ed] to memory problems and trouble focusing during certain parts of a day."  Id.  Plaintiff also testified that she used a CPAP machine at night. Id.  She found the mask "constricting," however, and could not "sleep straight through the night."  Id.  Plaintiff also testified to panic attacks and "becoming anxious at any time from three to five times a week."  Id. at 19.

The ALJ found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that the record was "not entirely consistent" with Plaintiff's testimony "concerning the intensity, persistence and limiting effects of these symptoms."  Id.  Further, the ALJ found, "[t]he medical evidence does not support greater limitations consistent with the claimant's statements."  Id.

The ALJ summarized the medical evidence to explain this distinction between the Plaintiff's claimed physical and mental limitations and the limitations the ALJ assigned.  Id. at 18-21.  Medical records demonstrated pain and swelling due to fibromyalgia "flares," but medical records also demonstrated that Plaintiff had "denied any fatigue, dizziness, anxiety, weakness, or leg swelling."  Id.  "More recent records noted the claimant had no tenderness in the neck of back, normal joints and muscle tone, normal motor strength, a normal gait, and good balance."  Id.  Similarly, while mental health records showed that Plaintiff–particularly after her mother's death–found herself "in shock, tearful, and struggling . . . feeling overwhelmed and having difficulty with concentration and memory," those records also showed that "her thought process was consistently recorded as concise or normal, she was pleasant and cooperative, judgment was good, and she was alert and oriented."  Id.  While Plaintiff consistently reported anxiety, depression, and feeling

overwhelmed, the medical records also reported improvement with treatment and
medication.  Id.  The ALJ also concluded that though Plaintiff "reported deficits in memory,
treatment records reflected no memory loss or normal memory."  Id.  In terms of her eyes,
the "[r]ecords related" that Plaintiff's "retinas were stable and acknowledged her reports of
mild headaches from light," but "[o]ther records denied photosensitivity."  Id. at 20.  Plaintiff
testified to 'blurry vision while using the computer."  Id.  A consultative examiner found that
Plaintiff's "best corrected vision" was 20/40-" and she had "[s]ome clouding, sclerosis, and
mild opacification . . . in the lenses, and areas of scarring were identified in the left eye."
Id.  "[T]esting showed defective central field thresholds on the left but a normal visual field
in the right eye."  Id.

The ALJ concluded that Platiniff's "activity levels do not support a greater degree of
limitation."  Id.  Plaintiff walked three days a week for 30 to 40 minutes.  Id.  She fed two
cats.  Id.  While Plaintiff had "difficulty reaching behind to button clothing" she did not have
other "big problems dressing."  Id.  Plaintiff set alarms on her phone or left other reminders
to take medications, and prepared food one or two times daily.  Id.  Plaintiff testified that
she could do "light housekeeping, laundry, some vacuuming, dishes, and light dusting."
Id.  Plaintiff drove and shopped weekly for groceries and clothing.  Id.  She paid bills,
counted change, and handled her savings account.  Id.  Plaintiff could follow written and
spoken instructions.  Id.  She did not describe any difficulties in "getting along with family,
friends, neighbors, or authority figures."  Id.  Walking up to one mile without needing to
stop and rest for five minutes seemed possible to the Plaintiff.  Id.  Sometimes motion
"alleviates discomfort" for the Plaintiff and sometimes such motion "exacerbates it."  Id.

The ALJ also pointed out that, despite Plaintiff's claims that she had difficulty

functioning on most days, she "was able to work on settling her deceased mother's

financial issues."  Id.  She traveled to Virginia and moved boxes, even though "she related

that she was very overwhelmed and that she would stay in bed all day if she could."  Id.

Plaintiff also "continued to deal with her father and her mother's estate, and all the

associated paperwork and phone calls."  Id.

The ALJ also noted that records from Plaintiff's chiropractor indicated "neck pain,

upper back pain, and headaches somewhat affected" her "daily activities," but the records

also "indicated that her daily activities were unaffected by her symptoms."  Id.  The fact

that Plaintiff's former employer–the United States Postal Service–"was unwilling to work

with her in terms of a finding a position she could tolerate," and accommodated Plaintiff's

"difficulty with stress, loud noises, bright lights, dirt, and prolonged sitting standing,

bending, lifting and carrying, pushing and pulling," also "suggest[ed] that the claimant was

willing to work within a set of accommodations."  Id.

Plaintiff's spouse testified to the fatigue, reduced stamina, discomfort, and limited

vision the Plaintiff faced.  Id. at 20-21.  He also reported her difficulties moving, vision

problems, and limits to memory and concentration.  Id. at 21.  While he testified that his

spouse did household tasks, he reported as well that "he often assists with helping the

claimant dress in certain clothing[.]"  Id. at 20.  Plaintiff performed some household chores,

he testified, "but he related that he often assists with chores and usually does the driving."

Id.  Plaintiff's husband had also "increasingly taken over" tasks like paying bills, counting

change, and handling the savings account.  Id.  Plaintiff went to church, read, and listened

to music, but her husband reported that "she has been less motivated to go to social

engagements."  Id.  The ALJ concluded that these statements "regarding the limiting

effects of the claimant's symptoms . . . are somewhat persuasive because they are largely consistent with those reported by the claimant, but they are not supported by objective clinical and diagnostic evidence or consistent with other evidence." Id. at 21.

The ALJ also considered the opinion evidence. Id. at 21-23. He held that he could not "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." Id. at 21.

The ALJ found the opinion of L. Hoffman, Ph.D., a State Agency psychological consultant, "persuasive." Id. Hoffman "identified no more than moderate limitations in mental functioning[.]" Id. The ALJ found support for these moderate limitations in "references to objective clinical evidence." Hoffman's assessment, the ALJ concluded, was also "consistent with the other evidence, including treatment records showing improved symptoms and noting the claimant declined to take her perscription mental health medication for several months." Id. The ALJ also found support in Dr. Hoffman's "Social Security disability program knowledge, and expertise in mental health." Id.

The ALJ concluded that the opinion of S. Gandhi, M.D., was "somewhat persuasive." Id. Dr. Gandhi found that Plaintiff "was capable of medium exertion with limited vision on the left and environmentals[.]" Id. The ALJ found support for this determination in "references to clinical and diagnostic evidence." Id. The opinion was also "generally consistent with the other evidence." Id. At the same time, the ALJ determined, "the opinion slightly overestimates the claimant's functional capacity in that it does not allow for position changes or acknowledge difficulties with noise or light levels." Id.

8

The ALJ next found "generally persuasive" the opinion of Charles A. Mango, M.D., a vitreous specialist. Id.  Dr. Mango found Plaintiff's "visual acuity is 20/25 in the right eye and 20/200 in the left, that her condition is stable, and she has no restrictions on activities as a result of a visual impairment." Id.  This opinion, the ALJ concluded, "is supported by acuity testing and is consistent with the other evidence." Id.  At the same time, the ALJ found that "in light of the limited acuity and central vision in the left eye, limitations specific to vision on the left are adopted." Id.

In contrast, the ALJ found that the opinion of Jean Rybinski, PA and Patrick Riccardi, MD, was "not persuasive." Id.  That opinion "indicated the claimant would be off task more than 20 percent of the day[.]" Id.  The ALJ noted that the opinion was "supported by reference to attached treatment records stating the questions in the form were answered per the patient responses, and no examination was performed." Id.  The ALJ also found that the opinion inconsistent "with other evidence including the claimant's activities, and treatment records showing improved symptoms and noting the claimant declined to take her prescription mental health medication for several months." Id. at 22.

The ALJ also found "not persuasive" another statement from Dr. Riccardi. Id.  In that statement, Riccardi limited Plaintiff "to frequently lifting and carrying seven pounds, standing and walking up to two hours, sitting less than six hours, and identifying limitations in prolonged sitting, standing, and bending, and exposure to chemical odors, stress, loud noise, bright lights, and heat and cold[.]" Id.  While the opinion made "references to clinical signs such as limited rotation of the cervical spine," Riccardi "otherwise referenced the claimant's reports in support of the stated limitations." Id.  The ALJ also found the opinion "not consistent with other evidence, including the claimant's activities, treatment

9

records showing normal gait and motor function, and chiropractic records showing symptoms only somewhat limited claimant's daily activities."  Id.

LCSW Joseph Ridgeway's opinion was "somewhat persuasive" to the ALJ.  Id. Ridgeway "reported the claimant needs a slow-paced, non-interactive position, that she can do low key non-stress work, that she does well in un-stressful social situations, and that she needs consistent rote kinds of tasks[.]"  Id.  Though the opinion came from "a non-acceptable medical source," that opinion had support in the record's "references to a sad affect and tearful but cooperative presentation, though content related to guilt, depressed mood, and impaired concentration."  Id.  Ridgeway's findings were "consistent with other evidence," in some sense, but the ALJ found "no support for finding the claimant needs a non-interactive position in light of the statements from this source that she is very cooperative and does well in non-stressful social situations."  Id.  The ALJ rejected another opinion from Ridgeway that determined Plaintiff was unable to work, as such issues are reserved for the Commissioner.  Id.

Another opinion the ALJ found "somewhat persuasive" came from Julie Middleton, NPP.  Id.  Middleton "acknowledged a degree of limitation in understanding and memory, sustained concentration and persistence, social interaction, and adaptation."  Id. Middleton further concluded that Plaintiff was "unable to function under stress[.]"  Id. While "[t]he opinion is not specific regarding the degree of limitation identified," Plaintiff's "depressed mood and tearful affect at times" supported such findings.  Id.  The ALJ also found the opinion "generally consistent with the other evidence."  Id.  The ALJ declined to find more restrictions than those listed in the RFC because "of treatment records showing improved mental health symptoms and noting the claimant declined to take her

10

prescription medication in favor of alternative treatments such as acupuncture and mediation." Id.  The ALJ rejected another opinion from Middleton that Nasri N. Ghaly, MD, also signed because the opinion concluded that Plaintiff could not work, an issue reserved for the Commissioner.  Id.

The ALJ found another opinion from Ghaly "unpersuasive." Id. at 22-23. Dr. Ghaly had concluded that Plaintiff had "no useful ability to function" in the area of "ability to maintain attention for two-hour segments and deal with normal work stress." Id. at 22. Ghaly also reported that Plaintiff could not "meet competitive standards in ten areas of mental functioning, that the claimant had serious limitation in six areas of mental functioning, and that she would be off task more than 20 percent of the workday and absent more than four days per month." Id. at 22-23.  The ALJ pointed out that the opinion came "in a form using language prepared by the claimant's representative, and identified few clinical signs in support of the limitations identified., including anhedonia, decreased energy, generalized anxiety, mood disturbance, difficulty thinking or concentrating, emotional lability, persistent disturbances of mood or affect, easy distractibility, and sleep disturbance." Id. at 23.  The ALJ concluded that "[t]he presence of these signs does not support the degree of limitation identified, and the doctor offered no explanation otherwise for such extreme limitations." Id.  Ghaly did not point to any "objective of clinical evidence" to "support [his] opinions regarding time off task or absences." Id.  Moreover, the opinion is inconsistent with evidence in the record of Plaintiff's activities and treatment records that showed improvement. Id.  The opinion, the ALJ emphasized, also fails to note that Plaintiff chose alternative medicine over her prescribed medication. Id.  Ghaly also opined on whether Plaintiff could work, an issue

11

reserved for the Commissioner.  Id.

At Step Four, the ALJ determined that Plaintiff could not perform any past relevant work.  Id.   The vocational expert had testified that a person with Plaintiff's RFC could not perform that work.  Id.  The ALJ noted that the Social Security Regulations defined Plaintiff, who was 52 years old on the date her alleged disability began, as "an individual closely approaching advanced age."  Id.

At Step Five, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy considering her "age, education, work experience, and residual functional capacity."  Id.  The ALJ consulted a vocational expert to determine whether Plaintiff's limitations prevented her from finding work, and the expert concluded that sufficient jobs existed despite those limitations.  Id.  The vocational expert testified that jobs like coffee maker, cook helper, and hospital food service worker existed in significant numbers in the national economy, and that Plaintiff could perform those jobs. Id.

Because of these findings, the ALJ ruled that Plaintiff was not disabled within the meaning of the Social Security Act.  Id.

## IV.   STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16,

1997)(Pooler, J.)(citing <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. <u>See</u> <u>Tejada</u>, 167 F.3d at 773; <u>Balsamo</u>, 142 F.3d at 79; <u>Cruz</u>, 912 F.2d at 11; <u>Rutherford v. Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be deemed conclusive if supported by substantial evidence. <u>See</u> 42 U.S.C. § 405(g); <u>see also</u> <u>Perez</u>, 77 F.3d at 46; <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted).

In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. <u>See</u> <u>Quinones v. Chater</u>, 117 F.3d 29, 36 (2d Cir. 1997)(citing <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982)); <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990).  Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" <u>Vargas v. Sullivan</u>, 898 F.2d 293, 296 (2d Cir. 1990)(quoting <u>Rivera v. Schweiker</u>, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.    ANALYSIS

Plaintiff contends that the ALJ lacked substantial evidence for his opinion because he did not evaluate the opinion evidence properly.

The Plaintiff disputes the evidentiary weight that the ALJ gave the various expert opinions.  For claims made after March 27, 2017, the ALJ is to consider the opinion evidence pursuant to the rules stated in 20 CFR 404.1520c.  Pursuant to that regulation, the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding[s], including those from your medical sources."  20 CFR 404.1520c(a).  The Administration applies factors laid out in 20 CFR 404.1520c(c)(1)-(c)(5) in evaluating such opinions.  Id.   Those factors consider the medical opinion's:  "(1) supportability"; "(2) consistency"; the author's "(3) relationship with the claimant," including the "length of the treatment relationship," "frequency of examinations," "purpose of the treatment relationship," "extent fo the treatment relationship," and whether the opinion author examined the claimant; (4) the "[s]pecialization" of the opinion author; and (5) other relevant factors, such as the author's familiarity with the underlying evidence or the rules of the disability program.  20 CFR 404.1520c(c)(1)-(c)(5).  The Administration also considers "whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical findings makes the medical opinion or prior administrative medical finding more or less persuasive." 20 CFR 404.1520c(c)(5).

These new rules "made the [earlier] 'treating physician rule' inapplicable to disability claims filed after March 27, 2017, and gave the ALJ and Commissioner more flexibility in weighing medical opinions on record."  Skartados v. Comm'r of Soc. Sec., No. 20-cv-3909,

14

2022 U.S. Dist. LEXIS at *24 n.9 (E.D.N.Y. Feb. 10, 2022).  For such claims, "no particular

deference or special weight is given to the opinion of the treating physician," and the

Administration "'will articulate in our determination or decision how persuasive we find all

of the medical opinions.'" Quiles v. Saul, No. 19cv11181, 2021 U.S. Dist. LEXIS 41725 at

*27 (S.D.N.Y. Mar. 5, 2021) (quoting 20 CFR 4040.1520c(b), 416.920c(b)).  In offering this

evaluation, "the ALJ must 'explain,' in all cases, 'how [he or she] considered' both the

supportability and consistency factors, as they are 'the most important factors.'" Segarra v

.Comm'r of Soc. Sec., No. 20cv5801, 2022 U.S. Dist LEXIS 29171 at *27 (S.D.N.Y. Feb.

17, 2022) (quoting 20 CFR 404.1520c(b)(2)).  In addition, "the ALJ is required to consider,

but need not explicitly discuss, the three remaining factors (i.e., relationship with the

claimant, specialization, and 'other')" when evaluating the medical opinions.  Velasquez v.

Kijakazi, No. 19cv9303, 2021 U.S. Dist. LEXIS 183349 at *59 (S.D.N.Y. Sept. 24, 2021).

If the ALJ finds "two or more medical opinions . . . equally supported and consistent with

the record, but not exactly the same, the ALJ must articulate how he or she considered

those three remaining factors."  Id.  "[T]he nature of an ALJ's inquiry in disability factfinding

turns on the substance of the medical opinion at issue–not its form–and ultimately whether

there is reasonable evidence in the record that supports the conclusions drawn by the

medical expert[.]" Colgan v. Kijakzi, 222 F.3d 353, 2022 U.S. App. LEXIS 53, at *14 (2d

Cir. 2022).

> The Plaintiff takes issue with the weight the ALJ assigned various opinions, which
the Court will address in turn.

### i.    Opinions of PA Rybinski and Dr. Riccardi

Plaintiff argues that the ALJ erred in discounting Dr. Riccardi's opinions about

Plaintiff's limitations in prolonged sitting, standing, bending, with chemical odors, stress, loud noise, and bright lights.  She contends that the ALJ wrongly discounted Dr. Riccardi's opinion because he relied on her subjective reports of pain.  Plaintiff suffers from fibromyalgia, and understanding that condition, Plaintiff claims, requires accepting subjective complaints of pain.  Moreover, Dr. Riccardi examined Plaintiff in reaching his conclusions about her discomfort and limitations.  The opinion was also consistent with the medical record, Plaintiff claims.  Accepting Riccardi's limitations would have required the ALJ to find that Plaintiff could not have performed sedentary work.  Plaintiff also contends that the ALJ "picked and chose" portions of the record in supporting his opinion that Rybinski's and Riccardi's opinion concerning Plaintiff's limitations was unpersuasive.  The ALJ ignored evidence that Plaintiff's symptoms continued in finding that they had improved.[1]

Dr. Riccardi's opinion is dated September 30, 2018.  See R. at 501-502.  Riccardi reports that he began treating the Plaintiff for fibromyalgia on February 28, 2013.  Id. at 501.  Riccardi states that Plaintiff's fibromyalgia began in 2010 and her symptoms include: "fatigue; generalized pain; decreased ability to concentrate; intolerance to stress, loud

_____

[1]The government argues, in part, that Plaintiff has waived the right to object to the weight assigned the expert opinions she disputes because she did not object to the weight the ALJ gave the state-examiner opinions that found fewer restrictions.  The government contends that those opinions were sufficient to support the ALJ's conclusions. The Court is not persuaded by this argument, since remand may be appropriate if an ALJ assigns improper weight to an opinion.  As explained, the ALJ is required to examine the opinions and utilize them to craft an understanding of a claimant's limitations.  If an ALJ assigns improper weight to an opinion, that opinion could have either an outsized or too-small role in drafting the RFC.  Changing the weight assigned to the opinions could change the limitations in an RFC.  Establishing a new set of limitations on remand is likely a necessary outcome of changing the weight assigned to the opinions.

noise, bright lights, [and] temperature extremes; and skin sensitivity."  Id.  He expected

Plaintiff's symptoms to continue for the rest of her life and noted that she reported that her

fibromyalgia is getting worse.  Id.  He further noted that she had displayed symptoms of

anxiety and depression.  Id.  Dr. Riccardi reported that Plaintiff had "limited rotations" in

her cervical spine and tightness in her scapula and trapezius.  Id.  He also reported that

she slept six to eight hours per night, "interrupted," and experienced fatigue.  Id.  Once

Plaintiff began to experience fatigue, she needed 2 hours to recover.  Id.  Plaintiff's

depression was "secondary" to her fatigue.  Id.  Riccardi did not offer any laboratory

findings.  Id.  Riccardi offered the opinion that Plaintiff could "frequently" lift and carry

seven pounds during the work day, she could walk up to two hours a day, and sit for less

than six hours a day.  Id. at 202.  Riccardi also opined that Plaintiff had limits to her ability

to push and/or pull, but did not specify the nature of such limitations.  Id.

Dr. Riccardi also noted that Plaintiff faced "other" limitations in several categories.

Id.  He stated that Plaintiff had limitations related to "prolonged sitting, standing, and

bending," but did not provide any specific times for such limitations.  Id.  Dr. Riccari also

declared "talking ok."  Id.  He also referenced "chemical odors, stress, loud noise, bright

lights, [and] limited by hot/cold."  Id.  Further, Riccardi reported bilateral hand/neck pain,

that Plaintiff was "legally blind" in her left eye, and that she had issues with "bilateral

manipulation," "fibromyalgia fog," and "poor concentration."  Id.  He did not explain the

nature of these limitations.

Plaintiff contends that the ALJ erred in finding this opinion unpersuasive.  She

argues that the ALJ improperly discredited Dr. Riccardi's report because he allegedly

relied on her complaints of pain from fibromyalgia and did not have sufficient clinical

confirmation of those complaints.  The law, Plaintiff points out, permits an expert to rely on subjective complaints in fibromyalgia cases and, in any case, Riccardi also used examination reports in support of his opinion.  Further, Plaintiff contends, Dr. Riccardi's opinion is consistent with the medical record.

Plaintiff points out that the nature of fibromyalgia has caused courts to take a particular approach to medical evidence.  See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003).  A court should not "'require 'objective' evidence for a disease that eludes such measurement."  Id.  Moreover, "[a]s a general matter, 'objective' findings are not required in order to find that an applicant is disabled."  Id. (citing Donato v. Sec. of Dept. of Health and Human Servs., 721 F.2d 414, 418-19 (2d Cir. 1983)).  The Second Circuit Court of Appeals has "recognized that fibromyalgia is a disabling impairment and . . . 'there are no objective tests which can conclusively confirm the disease.'"  Id. (quoting Preston v. Sec. of Health and Human Servs., 211 F.3d 1172, 1179-80 (9th Cir. 2000)).  Objective tests concerning range of motion and findings like "the absence of swelling joints or other orthopedic and neurologic deficits 'is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced.'"  Id. at 109 (quoting Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)).  In short, "[r]ather than rely on objective medical evidence in fibromyalgia cases,'[s]ubjective pain may serve as the basis for establishing disability.'"  Morris v. Berryhill, No. 1:16-cv-973, 2018 U.S. Dist. LEXIS 100186, at *12 (W.D.N.Y. June 14, 2018) (quoting Green-Younger, 335 F.3d at 108).  "[M]ere diagnosis of fibromyalgia without a finding as to the severity of the symptoms and limitations," however, "does not mandate a finding of disability."  Rivers v. Astrue, 280 Fed. Appx. 20, 22 (2d Cir. 2008).

The ALJ found Dr. Riccardi's opinion unpersuasive because Riccardi relied on Plaintiff's "reports in support of the stated limitations." R. at 22.  He also found that "[t]he opinion is not consistent with other evidence, including the claimant's activities, treatment records showing normal gait and motor function, and chiropractic records showing her symptoms only somewhat limited the claimant's daily activities." Id. at 22.  The Court agrees that the ALJ should not have discounted Plaintiff's claims of pain and limitations from her fibromyalgia by referencing a lack of clinical findings concerning gait and motor function.  If the ALJ had based his finding that the opinion was "unpersuasive" solely on the lack of medical records supporting Plaintiff's claims of pain, the Court would agree that the case should be remanded for a clearer explanation of the weight assigned Dr. Riccardi's opinion.  Here, however, the ALJ did not rely only on a lack of objective findings in rejecting Dr. Riccardi's opinion.  The ALJ pointed to other evidence of the record, such as Plaintiff's own daily activities and other parts of the medical record, like chiropractic treatments, that showed a lack of limitation from fibromyalgia.  The ALJ considered both the supportability and consistency of Dr. Riccardi's opinion in light of the other evidence of record and the Plaintiff's testimony.  The Court has examined this evidence and the Court must  find that substantial evidence supported the weight that the ALJ assigned to this opinion.

Dr. Riccardi and Jean Rybinski, PA, provided another opinion that Rybinski signed on August 28, 2019 and Dr. Riccardi signed on August 30, 2019.  See R. at 740-744.  They diagnosed Plaintiff with fibromyalgia and noted that Plaintiff stated that her condition was getting worse.  Id. at 740.  The report notes several "tender points" on a diagram, including Plaintiff's neck, shoulders, low back, rear end, upper rear thighs.  Id.  Riccardi

and Rybinski also checked blanks on the form that noted Plaintiff's particular symptoms; they included "multiple tender points, nonrestorative sleep, chronic fatigue, anxiety, and depression." Id. at 740-41.  Plaintiff also suffered pain in a variety of places, including her lumbrosacral spine, cervical spine, thoracic spine, chest, shoulders, hips, and knees/ankles/feet.  Id. at 741.  Her pain was bilateral where that term applied.  Id.  Plaintiff was tender to palpitation.  Id.  The pain came daily, but the intensity varied.  Id.  Pain seemed to come with changing weather, stress, fatigue, movement/overuse, and cold.  Id.  Riccardi and Rybinski did not complete the portion of the form intended to evaluate Plaintiff's "functional limitations" if she "were placed in a *competitive work situation*."  Id. (emphasis in original).  They noted that "FCE's [sic] need to be completed by qualified physical therapist or a physiologist."  Id.  The form also deferred to Dr. Ghaly for information about mental health treatment and medications and their effects.  Id. at 744.  Riccardi and Rybiski did note that anxiety exacerbated Plaintiff's fibromyalgia, and agreed that Plaintiff had "repeated episodes of deterioration or decompensation in work or worklike settings which cause the patient to withdraw from the situation or experience exacerbation of signs and symptoms (including deterioration of adaptive functioning)."  Id.  They also agreed that Plaintiff had "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere)." Id.  They reported that Plaintiff would be "off task" more than 20% of an eight-hour workday.  Id.  They had no knowledge of how many days per month Plaintiff would be absent from work due to her "impairments or treatment."  Id.

Plaintiff argues that the ALJ erred in finding unpersuasive Riccardi and Rybinski's opinion that Plaintiff "would be off task more than 20 percent of the day."  Id.  The ALJ

noted that the two did not perform any examination, and that they supported their conclusion by adopting Plaintiff's answers to a treatment form.  Id.  The ALJ found this opinion inconsistent with plaintiff's activities and the treatment records which showed improved symptoms and evidence that Plaintiff had stopped taking mental health medications. Plaintiff contends that the ALJ ignored medical records that supported this opinion, particularly ones that showed that Plaintiff "still continued to suffer from her impairments."

Plaintiff's complaint here is largely that the ALJ ignored medical evidence that supported the opinion.  "Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion." Smith v. Bowen, 687 F.Supp. 902, 904 (S.D.N.Y. 1988) (internal citation omitted).  An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Id. (quoting Ceballos v. Bowen, 649 F.Supp. 693, 700 (S.D.N.Y. 1986)).  An ALJ may not "cherry-pick the facts to support her conclusion." Patel v. Comm'r of Soc. Sec., No. 1:20-cv-0237, 2021 U.S. Dist. LEXIS 183435, at *7 (E.D.N.Y. Sept. 24, 2021); see also, Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) ("Although we do not require that, in rejecting a claim of disability, an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all medical evidence in a claimant's favor.") (internal citation omitted)).

While the ALJ's explanation of the reasons for discounting this opinion were stated briefly, the ALJ also explained elsewhere in his findings the level of activity that Plaintiff claimed and her responses to mental-health treatment.  See R. at 20.  He noted for instance, with references to the record, that Plaintiff was able to walk three times a week

21

for 40 to 90 minutes for exercise, fed two cats, had little difficulty dressing, used her phone to remind her to take medication, and did some housework.  Id.  She could also pay bills, count change, deal with banking, and "follow written and spoken instructions."  Id.  She got along with neighbors, and was able to help settle her mother's estate despite her depression and anxiety.  Id.  The ALJ also pointed to mental health records that indicated that Plaintiff had difficulties with anxiety and depression, as well as problems with concentration and memory, but also noted that "her thought process was consistently recorded as concise and normal, she was pleasant and cooperative, judgment was good, and she was alert and oriented."  Id. at 19.  Treatment records showed Plaintiff improving over time, even if she reported continued anxiety, especially when she failed to take her medication.  Id.

        The Court, having examined the record in this case, finds that the ALJ had substantial evidence for the weight he assigned Riccardi's and Rybinski's opinion.  The ALJ did not ignore the evidence that supported the Plaintiff's claims, but instead weighed that evidence against other evidence in the record which supported fewer limitations than Riccardi and Rybinski suggested.  In addition, the Court notes that Riccardi and Rybinski treated Plaintiff at Arthritis Health Associates, a specialty that does not focus on the ability of a patient to stay mentally on task.  The ALJ therefore did not err in finding that the opinion was not consistent with the medical evidence and was not supportable given the Plaintiff's reported daily activities and responsiveness to treatment.  In addition, the Court notes that "the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (i.e., relationship with the claimant, specialization, and 'other')" when evaluating the medical opinions.  Velasquez, 2021 U.S. Dist. LEXIS 183349 at *59.  Here,

the record supports a finding that the three remaining factors, particularly specialization, would support the ALJ finding, as he did, that the opinion was unpersuasive on a particular issue, Plaintiff's ability to stay on task.

### ii.   Dr. Ghaly

Plaintiff also challenges the weight assigned to Dr. Ghaly's opinion of September 18, 2019.  She contends that the ALJ erred by discounting Dr. Ghaly's opinion because he did not point to sufficient clinical evidence supporting the limitations he found.  Dr. Ghaly, who treated Plaintiff for mental disorders, could reasonably rely on Plaintiff's subjective complaints in coming to his conclusion, Plaintiff claims.  Moreover, Plaintiff argues, the medical evidence supports Dr. Ghaly's findings.  Plaintiff further argues that if the ALJ had properly evaluated Dr. Ghaly's opinion, he would have concluded that Plaintiff was disabled at the relevant time.

Dr. Ghaly provided the medical source statement in question on September 18, 2019.  See R. at 748-752.  He reported that he had seen Plaintiff beginning in July, 2013, and that she suffered from "major depression, recurrent, severe," as well as sleep apnea. Id. at 748.  Plaintiff's prognosis was "guarded."  Id.  Dr. Ghaly filled out a set of check boxes to identify Plaintiff's "signs and symptoms."  Id.  He found that she suffered from: "anhedonia or pervasive loss of interest in almost all activities"; "decreased energy"; "generalized persistent anxiety"; "mood disturbance"; "difficulty thinking or concentrating"; "emotional lability"; "persistent disturbances of mood or affect"; "easy distractibility"; and "sleep disturbance."  Id.

Another set of check boxes asked Dr. Ghaly to evaluate Plaintiff's "ability to do *work-related activities on a day-to-day basis in a regular work setting*."  Id. at 749

23

(emphasis in original).  In terms of limitations, Ghaly could choose from three options:
"*seriously limited, but not precluded*" meant that a person's "ability to function in this area
is seriously limited and less than satisfactory, but not precluded in all circumstances";
"*unable to meet competitive standards*" meant a person who could not "satisfactorily
perform this activity independently, appropriately, effectively and on a sustained basis in a
regular work setting"; and *"no useful ability to function"* amounted to "an extreme limitation"
that meant a person could not "perform this activity in a regular work setting." Id.
(emphases in original).   Dr. Ghaly reported that Plaintiff's performance would be "limited
but satisfactory" in her ability to "[b]e aware of normal hazards and take appropriate
precautions" and "[a]dhere to basis standards of neatness and cleanliness." Id.  He found
her "seriously limited but not precluded" in her ability to: "[u]nderstand and remember very
short and simple instructions"; "[c]arry out very short and simple instructions"; "[a]sk simple
questions or request assistance"; "[i]nteract appropriately with the general public"; "[t]ravel
in [an] unfamiliar place"; and "[u]se public transportation." Id.  Plaintiff could not "meet
competitive standards" in her ability to: "[r]emember work-like procedures"; "[s]ustain an
ordinary routine without special supervision"; "[w]ork in coordination with or proximity to
others without being unduly distracted"; "[m]ake simple work-related decisions";
"[c]omplete a normal workday and workweek without an unreasonable number and length
of rest periods"; "[p]erform at a consistent pace without an unreasonable number and
length of rest periods"; "[a]ccept instructions and respond appropriately to criticism from
supervisors"; "[g]et along with co-workers or peers without unduly distracting them or
exhibiting behavioral extremes"; "[r]espond appropriately to changes in a routine work
setting"; and "[m]aintain socially appropriate behavior." Id.  Ghaly also opined that Plaintiff

had "[n]o useful ability to function" in the areas of "[m]aintain[ing] attention for [a] two hour segment" and "deal[ing] with normal work stress." Id.

Other parts of the form asked specific questions about Plaintiff's capacities. Ghaly checked boxes that affirmed that Plaintiff had "repeated episodes of deterioration or decompensation in work or work-like settings which cause the patient to withdraw from the situation or experience exacerbation of signs and symptoms (including deterioration of adaptive functioning)." Id. at 750. He also reported that Plaintiff suffered from "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere)." Id. Plaintiff would, he affirmed, have "'good days' and 'bad days,'" and that she would be "off task" for more than 20% of an eight-hour workday." Id. Plaintiff would also be absent from work more than four days each month "as a result of the impairments or treatment." Id.

The ALJ found this opinion "not persuasive." Id. at 23. He noted that "[t]he opinion was given in a form using language prepared by the claimant's representative, and identified few clinical signs in support of the limitations identified[.]" Id. The ALJ concluded that "[t]he presence of these signs does not support the degree of limitation identified, and the doctor offered no explanation otherwise for such extreme limitations." Id. Moreover, "[n]o objective or clinical evidence was identified in support of the doctor's opinions regarding time off task or absences." Id. The ALJ found inconsistency between these restrictions and "the other evidence, including the claimant's activities and treatment records showing improved mental health symptoms and noting the claimant declined to take her prescription medication in favor of alternative treatment[.]" Id. As explained, the ALJ had earlier described Plaintiff's mental-health treatment in greater detail.

25

The Plaintiff points to case law that holds that a patient's subjective complaints are an essential part of diagnosis for mental disorders.  See, e.g., Showers v. Colvin, No. 3:13cv1147, 2015 WL 1383819 at *8 n.18 (N.D.N.Y. Mar. 25, 2015).  The Plaintiff is correct that "a treating psychiatrist must consider a patient's subjective complaints . . . to diagnose a mental disorder.  In fact, whether dealing with mental health or not, consideration of a 'patient's report of complaints, or history, [a]s an essential diagnostic tool,' is a medically acceptable clinical and laboratory diagnostic technique."  Santana v. Astrue, 2013 WL 1232461 at *14 (E.D.N.Y. Mar. 26, 2013) (quoting Hernandez v. Astrue, 814 F.Supp.2d 168, 182 (E.D.N.Y. 2011)).  Indeed, "objective" tests are not always a part of psychiatric care, and "a psychiatrist typically treats the patient's subjective symptoms or complaints about those symptoms."  Id.  It might not even been clear "what 'objective' tests" a psychiatrist could "perform to confirm their diagnosis."  Id.

This case law makes clear that the ALJ would have erred if he rejected Dr. Ghaly's opinion on the basis of a lack of "objective" findings regarding the nature of Plaintiff's mental illness.  The Court finds, however, that the ALJ did not rely only on an alleged lack of objective clinical or diagnostic evidence in determining that Dr. Ghaly's opinion was not persuasive.  The ALJ did find that Ghaly had offered no "objective clinical or diagnostic evidence . . . in suffer of the doctor's opinions regarding time off task or absences."  R. at 23.  In isolation, this finding might represent error, since the ALJ appears here to require that Dr. Ghaly present some sort of measurement to establish Plaintiff's time off task or absences.  Read as part of the ALJ's larger description of Plaintiff's symptoms, her reports of her daily activities, and a medical record which shows Plaintiff improving with mental health treatment, however, the Court reads the ALJ's conclusion to be that the "extreme"

26

restrictions stated in Dr. Ghaly's report are not supported by the record and not consistent with the medical evidence contained in the record and in Dr. Ghaly's treatment notes in particular.

Plaintiff also contends that the evidence of record in this case, including the treatment notes and other expert opinions, is consistent with Dr. Ghaly's conclusions.  The Court finds that substantial evidence supports the ALJ's conclusions concerning Dr. Ghaly's report.  As outlined above, the ALJ carefully considered the medical evidence that existed in this case, and pointed to treatment notes that established that Plaintiff suffered from depression and anxiety.  The ALJ pointed both to Plaintiff's subjective complaints and the diagnoses of various treating physicians in making this finding.  The ALJ also pointed to evidence in the record, including Plaintiff's own reports, that indicated that she had improved with various mental-health treatments, and that she continued a level of daily activity that indicated that the restrictions Dr. Ghaly imposed overstated her limitations.  Having reviewed the record, the Court concludes that substantial evidence supports the weight the ALJ supplied to Dr. Ghaly's opinions.

The Court must therefore find that substantial evidence supports the weight the ALJ applied to the expert opinions in this matter and the ALJ's ultimate conclusion that the Plaintiff was not disabled within the meaning of the Social Security Act at the time relevant to this litigation.

## V.    Conclusion

For the reasons stated above, Plaintiff's motion for judgment on the pleadings, dkt. # 15, is hereby DENIED.  The defendant's motion for judgment on the pleadings, dkt. # 16, is hereby GRANTED.  The Clerk of Court is directed to enter judgment for the

Defendant and close the case.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

**Dated: March 7, 2022**